```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                    FORT PIERCE DIVISION
                  CASE NO.  21-CR-14035-JEM
 3

 4    UNITED STATES OF AMERICA,

 5                Plaintiff,

 6         vs.

 7                                        August 25, 2022
      JORGE CHICA-GILER,                  Miami, Florida
 8                                        Pages 1-28
                  Defendant.
 9    _____

10         TRANSCRIPT OF EVIDENTIARY HEARING AND CALENDAR CALL
                  CONDUCTED VIA ZOOM VIDEOCONFERENCING
11               BEFORE THE HONORABLE JOSE E. MARTINEZ
                    UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14    FOR THE PLAINTIFF:   Christopher Hudock, A.U.S.A.
                           United States Attorney's Office
15                         101 South U.S. Highway 1
                           Suite 3100
16                         Fort Pierce, FL 34950

17

18    FOR THE DEFENDANT:   Jacob Alain Cohen, Esq.
                           Law Offices of Jacob A. Cohen, PLLC
19                         750 S. Dixie Highway
                           Boca Raton, FL 33432
20

21

22
      REPORTED BY:         DAWN M. SAVINO, R.P.R., C.R.R.
23                         Official Federal Court Stenographer
                           400 N. Miami Avenue, 10S03
24                         Miami, Florida  33128
                           Telephone:  305-523-5598
25                         Dawn_Savino@flsd.uscourts.gov
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**

|   |   |   |
|---|---|---|
| | 1 | (Court called to order) |
| 1:51 PM | 2 | THE COURT:  Mr. Chica-Giler, can you hear?  Is it? |
| 1:51 PM | 3 | Spanish, are you understanding the Spanish interpretation? |
| 1:51 PM | 4 | THE DEFENDANT:  (In English) Yeah, I understand in |
| 1:51 PM | 5 | Spanish. |
| 1:51 PM | 6 | THE COURT:  Okay.  Sounds like you could get along |
| 1:51 PM | 7 | either way so if you have -- |
| 1:51 PM | 8 | MR. COHEN:  Your Honor, I'm sorry for interrupting. |
| 1:51 PM | 9 | It's Jacob Cohen, his counsel.  He doesn't understand English |
| 1:51 PM | 10 | well enough. |
| 1:51 PM | 11 | THE COURT:  Okay.  I understand.  I'm just saying, |
| 1:51 PM | 12 | Mr. Chica-Giler, if you have a problem with the interpretation |
| 1:51 PM | 13 | or communication, please raise your hand so that it can be seen |
| 1:51 PM | 14 | and then we'll stop and wait until we fix it.  Do you understand |
| 1:51 PM | 15 | what I just said? |
| 1:51 PM | 16 | THE DEFENDANT:  I'm a little bit -- really, I don't |
| 1:51 PM | 17 | understand you telling me in English. |
| 1:51 PM | 18 | THE COURT:  Well, that's just it.  We're supposed to be |
| 1:52 PM | 19 | getting interpreted.  Are you getting any Spanish at all? |
| 1:52 PM | 20 | THE DEFENDANT:  *Sí.* |
| 1:52 PM | 21 | (Through Spanish Interpreter) Yes, I can hear you. |
| 1:52 PM | 22 | THE COURT:  All right.  Very well.  Then call the case |
| 1:52 PM | 23 | please. |
| 1:52 PM | 24 | LAW CLERK:  One second, Judge. |
| 1:52 PM | 25 | THE COURT:  Mike, are you fixing something?  Is it |

| | | |
|---|---|---|
| 1:52 PM | 1 | fixed? |
| 1:52 PM | 2 | LAW CLERK:  Mike, there's an issue with the zoom |
| 1:52 PM | 3 | appearing in the courtroom.  The court reporter cannot see the |
| 1:52 PM | 4 | zoom on her screen in the courtroom. |
| 1:52 PM | 5 | IT TECHNICIAN:  Is Judge PC selected on the touch |
| 1:52 PM | 6 | panel? |
| 1:52 PM | 7 | LAW CLERK:  It is.  It was something with the settings. |
| 1:52 PM | 8 | IT TECHNICIAN:  It might have been what Sergio had done |
| 1:52 PM | 9 | earlier.  So I think Judge had agreed to leave it as is for now. |
| 1:52 PM | 10 | I can either send Sergio back up if you guys want. |
| 1:53 PM | 11 | THE COURT:  We're going to have an evidentiary hearing, |
| 1:53 PM | 12 | so I think that everybody needs to be onboard and they need to |
| 1:53 PM | 13 | be able to see it on the screens there.  So please send whoever. |
| 1:53 PM | 14 | IT TECHNICIAN:  Okay.  Give me one second, Your Honor. |
| 1:53 PM | 15 | I'll ask Sergio to help out with that. |
| 1:53 PM | 16 | THE COURT:  I'm here all day and I'm pretty sure |
| 1:53 PM | 17 | Mr. Chica-Giler is not going anywhere too.  Mr. Cohen is getting |
| 1:53 PM | 18 | the big bucks for doing this. |
| 1:54 PM | 19 | Never mind.  We got it figured out.  My crack law clerk |
| 1:54 PM | 20 | -- not my law clerk on crack, but my crack law clerk has figured |
| 1:54 PM | 21 | it out. |
| 1:54 PM | 22 | Can we get started now then? |
| 1:54 PM | 23 | COURTROOM DEPUTY:  Case number |
| 1:54 PM | 24 | 21-14035-criminal-Martinez, United States of America versus |
| 1:54 PM | 25 | Jorge Chica-Giler. |

1:54 PM  1       Counsel, please state your name for the record starting

1:54 PM  2  with the Government.

1:54 PM  3       MR. HUDOCK:  Good afternoon, Your Honor.  Chris Hudock

1:54 PM  4  on behalf of the United States.

1:54 PM  5       THE COURT:  Mr. Hudock.

1:54 PM  6       MR. COHEN:  Your Honor, good afternoon.  Jacob Cohen on

1:54 PM  7  behalf of Jorge Chica-Giler, the Defendant, and he's on Zoom

1:54 PM  8  from the St. Lucie County Jail, Your Honor.

1:54 PM  9       THE COURT:  Good afternoon, Mr. Cohen.

1:54 PM 10       All right.  We're here today for a calendar call and

1:55 PM 11  for an evidentiary hearing on the Government's motion in limine.

1:55 PM 12       First of all, I want to get a feel for -- originally

1:55 PM 13  this was set to be -- require eight to ten or six to ten days.

1:55 PM 14  Is that still the best estimate?

1:55 PM 15       MR. HUDOCK:  Yes, Judge.  That is the best estimate.

1:55 PM 16  We had reached out to counsel to get some stipulations to

1:55 PM 17  shorten the trial.  Unfortunately we were not able to reach an

1:55 PM 18  agreement on those stipulations, so we expect that the trial

1:55 PM 19  will take between six to eight days.

1:55 PM 20       THE COURT:  It's a major problem.  I don't have the

1:55 PM 21  courtroom for that long, but I'll make it work.  We'll figure it

1:55 PM 22  out.  We might be changing courtrooms in the middle of the

1:55 PM 23  trial.

1:55 PM 24       All right.  The government has moved to preclude the

1:55 PM 25  defendant from presenting a duress defense to the jury.  Before

| | |
|---|---|
| 1:55 PM   1 | presenting a duress defense, the defendant must first produce or |
| 1:55 PM   2 | proffer evidence sufficient to prove the elements of the |
| 1:56 PM   3 | defense.  The elements are that the defendant performed the |
| 1:56 PM   4 | unlawful act because:  One, he was under an immediate threat of |
| 1:56 PM   5 | death or serious bodily injury; two, he had a well-grounded fear |
| 1:56 PM   6 | that the threat would be carried out, and three, he had no |
| 1:56 PM   7 | reasonable opportunity to escape. |
| 1:56 PM   8 | I will allow the defendant to present a duress defense |
| 1:56 PM   9 | only if there is foundation for the evidence for the defense. |
| 1:56 PM  10 | Because we're here on the government's motion in limine, I will |
| 1:56 PM  11 | allow it to present its argument first, and then the defendant |
| 1:56 PM  12 | can respond by presenting his evidence in support of the duress |
| 1:56 PM  13 | defense. |
| 1:56 PM  14 | Government, you may proceed. |
| 1:56 PM  15 | MR. HUDOCK:  Thank you, Your Honor.  Your Honor, as |
| 1:56 PM  16 | you've previously articulated, you've restated the government's |
| 1:56 PM  17 | position that in this particular instance, in order for the |
| 1:56 PM  18 | defense to present a duress defense, there must first be |
| 1:56 PM  19 | evidence or proffered testimony with respect to that defense |
| 1:57 PM  20 | that would prove the essential elements of that defense.  That's |
| 1:57 PM  21 | represented in United States versus Montgomery which is 772 F.2d |
| 1:57 PM  22 | 773 in the Eleventh Circuit from 1985.  It is also represented |
| 1:57 PM  23 | in the Supreme Court case United States V Bailey, 444 US 394, |
| 1:57 PM  24 | 1980, as well as United States V Lewis, 157 Federal Appx out of |
| 1:57 PM  25 | the Eleventh Circuit in 2005. |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 1:57 PM | 1  | We would reiterate the elements that Your Honor has |
| 1:57 PM | 2  | elucidated earlier, that the defendant must establish that the |
| 1:57 PM | 3  | defendant acted under an immediate threat of death or serious |
| 1:57 PM | 4  | bodily injury; that he had a well-grounded fear that the threat |
| 1:57 PM | 5  | would be carried out, and that the defendant had no reasonable |
| 1:57 PM | 6  | opportunity to escape or to inform the police.  And those are |
| 1:58 PM | 7  | outlined in United States V Alzate which is 47 F.3d 1103 from |
| 1:58 PM | 8  | the Eleventh Circuit in 1995, and United States V Sixty Acres in |
| 1:58 PM | 9  | Alachua County, which is 930 F.2d 857 Eleventh Circuit, 1991. |
| 1:58 PM | 10 | We would point out to Your Honor that in Sixty Acres, |
| 1:58 PM | 11 | the court paid particular attention to the immediacy requirement |
| 1:58 PM | 12 | as it relates to elements one and three.  The court stated, and |
| 1:58 PM | 13 | I quote, that a requirement of immediacy of the threat is a |
| 1:58 PM | 14 | rigorous one, and it is clear that the fear of future bodily |
| 1:58 PM | 15 | harm to one's self or to others will not suffice.  In order that |
| 1:58 PM | 16 | the danger may be viewed as imminent and intended, it is |
| 1:58 PM | 17 | ordinarily necessary to show that the coercing party was |
| 1:58 PM | 18 | present.  Moreover, the apprehension of immediate danger must |
| 1:58 PM | 19 | continue during the whole time the crime is committed.  Finally, |
| 1:59 PM | 20 | if the accused had a reasonable opportunity to avoid committing |
| 1:59 PM | 21 | the illegal act without subjecting himself to the threatened |
| 1:59 PM | 22 | harm, or subsequently ignored a reasonable opportunity to escape |
| 1:59 PM | 23 | the source of compulsion, the defense of duress is no longer |
| 1:59 PM | 24 | available. |
| 1:59 PM | 25 | And so we would point Your Honor's attention to that |

1:59 PM  1    language because it's the government's position that the defense

1:59 PM  2    will not be able to present evidence or testimony as to Elements

1:59 PM  3    One or Three.

1:59 PM  4         Element One requires that immediate threat of imminent

1:59 PM  5    bodily harm or death, and we can prove to Your Honor through

1:59 PM  6    evidence and testimony that this conspiracy began in January of

1:59 PM  7    2011 and continued through August of 2011.  During that time,

1:59 PM  8    the defendant was not under constant surveillance by the other

1:59 PM  9    parties involved in the conspiracy.  He lived in his apartment,

2:00 PM  10   he had a vehicle, and he was free to travel throughout Broward,

2:00 PM  11   Miami-Dade and St. Lucie Counties, as well as West Palm Beach.

2:00 PM  12   And during that time, we will present evidence and testimony at

2:00 PM  13   trial that he did so, and that he was not under constant

2:00 PM  14   surveillance and not under constant threat of imminent bodily

2:00 PM  15   harm or death.

2:00 PM  16        We will also provide physical evidence to Your Honor in

2:00 PM  17   the form of receipts, in the form of video surveillance that

2:00 PM  18   will show that the defendant was not under constant surveillance

2:00 PM  19   during that time.  And that evidence and testimony will also

2:00 PM  20   show that the defense cannot meet Element Three.  During those

2:00 PM  21   times the defendant was far away from the people that he claims

2:00 PM  22   to have threatened him, and he had multiple opportunities to

2:00 PM  23   report the threats and the conduct to the police, yet he failed

2:00 PM  24   to do so.

2:00 PM  25        We will also provide you with conversations between the

2:00 PM  1   defendant and the person that we believe he will allege had

2:01 PM  2   threatened him.  Those conversations began in April of 2021 and

2:01 PM  3   continued through August of 2021.  During those conversations

2:01 PM  4   the defendant threatens to quit participating in the scheme if

2:01 PM  5   he's not paid, and he also talks about the opportunity for

2:01 PM  6   himself and others to torture people who were not participating

2:01 PM  7   in the scheme as they were supposed to.

2:01 PM  8        So the evidence and testimony will not only show that

2:01 PM  9   the defendant failed to report these threats to law enforcement,

2:01 PM  10  that he failed to abate his unlawful conduct as required in

2:01 PM  11  Element Three, but also that he was not only not under constant

2:01 PM  12  surveillance, but an active participant in the scheme; a person

2:01 PM  13  who advanced the threatening and unlawful activities of his

2:01 PM  14  co-conspirators, not somebody who was coerced or somebody who

2:01 PM  15  felt threatened to participate in the scheme.

2:01 PM  16        And for those reasons, Your Honor, we do not believe

2:02 PM  17  that the defense will be able to put on sufficient evidence in

2:02 PM  18  order to establish the duress defense.

2:02 PM  19        Now, we would turn Your Honor's attention to United

2:02 PM  20  States V Alvier (ph), which is cited in our response in which

2:02 PM  21  the Eleventh Circuit affirmed a conviction of a defendant where

2:02 PM  22  the court actually excluded a duress defense for failure to meet

2:02 PM  23  these elements.  In that case the defendant testified that he

2:02 PM  24  believed that he had to take some heroin to the United States

2:02 PM  25  from Ecuador because if he did not, his family in Ecuador would

2:02 PM  1   be harmed.  He did not testify if anyone specifically threatened

2:02 PM  2   harm to him or his family, he did not testify if anyone was

2:02 PM  3   standing by to execute the threat, and he did testify that he

2:02 PM  4   feared that he was being watched which was the reason he didn't

2:02 PM  5   report the threats to the airline staff.  The court found that

2:02 PM  6   this general apprehension of future harm was insufficient, and

2:02 PM  7   it also found that even if his fear of being watched was

2:02 PM  8   established as an immediate threat, that he was not in custody

2:03 PM  9   of the trafficker at the time of the threat and therefore had a

2:03 PM  10  duty to alert Customs the moment he landed in the United States.

2:03 PM  11          We would analogize that case here, Your Honor, that the

2:03 PM  12  threats are remote, they're not proximate and they are not

2:03 PM  13  immediate, and the evidence will not show any of those things,

2:03 PM  14  and the defense will not be able to establish elements one or

2:03 PM  15  three of the duress defense.  And for those reasons, we would

2:03 PM  16  ask Your Honor to grant our motion to exclude.

2:03 PM  17          THE COURT:  Mr. Cohen?  Do you have a comment before we

2:03 PM  18  have any evidence?

2:03 PM  19          MR. COHEN:  Your Honor, my overarching response is if

2:03 PM  20  there is any foundation of the evidence, even if it's weak,

2:03 PM  21  under United States v Lively, 803 F.2d, 1124 at 1126, Eleventh

2:03 PM  22  Circuit, 1986, even if that evidence is of doubtful credibility,

2:04 PM  23  if the foundational predicates are established, then the jury

2:04 PM  24  instruction ought to be read to the jury.  So I'm respectfully

2:04 PM  25  asking that the Honorable Court, before we give our proffer,

2:04 PM 1   look at that proffer through that prism and then make a decision

2:04 PM 2   as to whether or not we've provided sufficient evidence to have

2:04 PM 3   that duress coercion jury instruction read to the jury.

2:04 PM 4              THE COURT:  Well, I can only tell you that in 20 years

2:04 PM 5   as a judge I have not seen one case where the evidence was

2:04 PM 6   sufficient to present a duress defense.  I don't have any

2:04 PM 7   problem with waiting to see what the evidence might be, but I

2:04 PM 8   think that this is the purpose of this hearing is to prevent the

2:04 PM 9   duress material being introduced unless there is some foundation

2:04 PM 10  for it.

2:04 PM 11             How do we proceed?  Government, do you have witnesses

2:05 PM 12  to present?  Do you have records that you're going to read?  How

2:05 PM 13  are you going to do this?

2:05 PM 14             MR. HUDOCK:  Your Honor, in this particular case the

2:05 PM 15  burden is on the defense to show that there would be sufficient

2:05 PM 16  evidence to present the duress defense, and that would be

2:05 PM 17  established in United States versus Montgomery, United States

2:05 PM 18  versus Bailey and United States versus Louis.  Specifically the

2:05 PM 19  court in Montgomery indicated that a defendant must first

2:05 PM 20  produce or proffer evidence sufficient to prove the essential

2:05 PM 21  elements of the defense.  So it would be our position that at

2:05 PM 22  this hearing the defense must be ready to present whatever

2:05 PM 23  evidence or testimony it would present at trial in order to

2:05 PM 24  establish a duress defense before it would shift to the

2:05 PM 25  government to rebut those arguments.

2:05 PM 1          THE COURT:  It seems to me that it's going to be

2:05 PM 2     virtually impossible for the defense to present this without the

2:05 PM 3     defendant testifying.  Since it is extremely unusual for a

2:05 PM 4     defendant to testify, I'm going to ask Mr. Cohen, how do you

2:05 PM 5     propose to present even the bare minimum evidence in this case?

2:06 PM 6          MR. COHEN:  Your Honor, I think that's a very good

2:06 PM 7     point.  I'd still like to try with the factual proffer and see

2:06 PM 8     where we get with it.  I don't want Mr. Chica-Giler testifying.

2:06 PM 9          THE COURT:  Well, I can understand that.  In my

2:06 PM 10    experience defending and prosecuting, I don't think I ever

2:06 PM 11    really saw where it was beneficial to the defense to take the

2:06 PM 12    stand.  But go at it and tell me how you're going to prove this

2:06 PM 13    duress defense.

2:06 PM 14         MR. COHEN:  Your Honor, if Mr. Chica-Giler testifies at

2:06 PM 15    trial, we plan on introducing the following evidence which would

2:06 PM 16    be elicited through him:

2:06 PM 17         Mr. Chica-Giler is from Ecuador.  He came here on a

2:07 PM 18    temporary visa.  He contacted an individual whose name was

2:07 PM 19    Ernesto Teran, and I'm going to spell that for the record, E R N

2:07 PM 20    E S T O, last name T E R A N.  And Ernesto is from Ecuador.  We

2:07 PM 21    don't know what his legal status is in the United States.  The

2:07 PM 22    SunBiz records show that he works for a company called Be Tech

2:07 PM 23    Group, LLC.  That first word is spelled B E, the second word is

2:07 PM 24    spelled T E C H.  The second word is Group and then, comma, LLC.

2:07 PM 25    The address of the business is 5900 Northwest 99th Avenue, Suite

2:07 PM   1    7 in Doral, Florida, and the zip code, Your Honor, is 30178.

2:07 PM   2            Now, Mr. Teran was friends with Mr. Chica-Giler in

2:08 PM   3    Ecuador.  When Mr. Giler arrives in Miami he needs work, so he

2:08 PM   4    meets with Mr. Teran and Mr. Teran provides him a job at his

2:08 PM   5    warehouse.  He's involved in various businesses, but the

2:08 PM   6    business that Mr. Chica-Giler was helping him with was with the

2:08 PM   7    cellphone business.  Mr. Giler initially would go meet third

2:08 PM   8    parties who were doing business with Mr. Teran.  Mr. Giler was

2:08 PM   9    given envelopes by Mr. Teran, and those envelopes would be given

2:08 PM  10    to the third parties, and in exchange for the envelopes -- and I

2:08 PM  11    want to emphasize, Your Honor, that Mr. Giler does not know

2:08 PM  12    what's inside of the envelopes.  In exchange for those envelopes

2:08 PM  13    the third parties give boxes of various sizes to Mr. Giler.

2:08 PM  14    Giler, Mr. Giler, does not look in the boxes, he never sees them

2:09 PM  15    opened up, but he assumes that the items inside have to do with

2:09 PM  16    the cellphone business that Ernesto Teran is involved in.

2:09 PM  17            Episodically in terms of the next phase of this case

2:09 PM  18    Your Honor, the relationship evolves between them and my client.

2:09 PM  19    Mr. Chica-Giler ends up being a full-time assistant for Ernesto,

2:09 PM  20    and he's involved in the activities that I just described to

2:09 PM  21    you.

2:09 PM  22            One evening, Ernesto Teran invites my client, Jorge

2:09 PM  23    Chica-Giler, to his home and there is a Zoom meeting that is

2:09 PM  24    orchestrated by an individual Andres, that name is A N D R E S.

2:09 PM  25    Mr. Giler does not know the last name.  This meeting takes place

2:10 PM  1    at Ernesto Teran's house.  There are two individuals from a drug

2:10 PM  2    gang from Ecuador, the name of that gang, Your Honor, is Los

2:10 PM  3    Choneros.  That is spelled L O S, C H E N R O S (sic).  And in

2:10 PM  4    the media, if you're reading anything about Ecuador, they are a

2:10 PM  5    very prominent gang there and intertwined with the society there

2:10 PM  6    in a very negative way.

2:10 PM  7         One of the leaders of Los Choneros, I'm going to say

2:10 PM  8    the name first then I'm going to spell it, Your Honor.  Is Jose

2:10 PM  9    Adolfo Fito Macias Villamar.  The first name is Jose, J O S E.

2:10 PM  10   The second name is A D O L F O, in scare quotes is Fito, F I T

2:10 PM  11   O, that's his nickname, Macias, M A C I A S, and the last name

2:11 PM  12   is Villamar, V I L L A M A R.

2:11 PM  13        The third individual in there is Christian Tinajero.

2:11 PM  14   Christian is spelled C H R I S T I A N, and the last name is T I

2:11 PM  15   N A J E R O.

2:11 PM  16        It's at this Zoom meeting that it is disclosed to

2:11 PM  17   Mr. Chica-Giler that he -- they need him being a mule for him in

2:11 PM  18   this case in terms of helping transport guns to Ecuador.  And

2:11 PM  19   they make the direct threat that if he doesn't do it, that he

2:11 PM  20   knows who they are and they will harm his family and they will

2:11 PM  21   harm him.

2:11 PM  22        Now, I'm expecting the government to say in response to

2:11 PM  23   that that that's not an immediate enough threat.

2:12 PM  24   Mr. Chica-Giler's response to that is this:  Initially

2:12 PM  25   Mr. Chica-Giler is a chef, he was trained in Ecuador and he also

2:12 PM 1    trains -- he also does DJ work and he was going to do that for

2:12 PM 2    Ernesto Teran.  There are parties that they would have.

2:12 PM 3    Mr. Chica-Giler doesn't know the names, but Mr. Chica-Giler's

2:12 PM 4    position is that there's rogue law enforcement officers from

2:12 PM 5    Miami, he doesn't know which department, but they were at the

2:12 PM 6    parties.  And these matters were also represented to Mr. Giler.

2:12 PM 7            So Mr. Giler feels boxed in.  If he doesn't commit

2:12 PM 8    these acts, he's worried that his family in Ecuador is going to

2:12 PM 9    be harmed, and he's worried that he's going to be harmed because

2:13 PM 10   these individuals have -- they have the police locally on the

2:13 PM 11   take.

2:13 PM 12           My client's passport's stolen and his computer is

2:13 PM 13   stolen so he's further isolated.  He assumes that these

2:13 PM 14   individuals -- he assumes that Ernesto Teran was involved in it,

2:13 PM 15   but he doesn't know for sure.

2:13 PM 16           Your Honor, and then after that my client gets

2:13 PM 17   involved.  And his response to the government's position is that

2:13 PM 18   he actively over-dramatized his role in this because he didn't

2:13 PM 19   want any of these individuals getting upset with him and hurting

2:13 PM 20   his family in Ecuador and hurting him in Florida.

2:13 PM 21           So against the backdrop of the case that I read to you

2:13 PM 22   where we just need any foundation of evidence, even if you find

2:13 PM 23   it weak, Your Honor, the Lively case and I read it into the

2:13 PM 24   record, it's our respectful view, Your Honor, that based on that

2:14 PM 25   Mr. Chica-Giler should be allowed to use the duress defense, the

2:14 PM   1    coercion defense in front of the jury, and the jury should

2:14 PM   2    decide whether or not his view is credible or if the government

2:14 PM   3    has a stronger view and overcomes the presumption of innocence

2:14 PM   4    and reasonable doubt.

2:14 PM   5         Again Your Honor, our burden of proof is preponderance

2:14 PM   6    of the evidence.  The government has to rebut our defense

2:14 PM   7    against the backdrop and reality of reasonable doubt.  So we

2:14 PM   8    have a much lower burden than they do.  And it's our respectful

2:14 PM   9    view, Your Honor, that given this factual proffer that we've

2:14 PM   10   laid out, that we've established enough for Mr. Giler to be able

2:14 PM   11   to use this defense at trial.

2:14 PM   12        THE COURT:  All right.  Government, do you have

2:14 PM   13   questions or comments?

2:14 PM   14        MR. HUDOCK:  I do, Your Honor.  And if Your Honor would

2:14 PM   15   allow, I can call an agent or I can proffer the testimony to

2:14 PM   16   Your Honor, however you would prefer.

2:14 PM   17        THE COURT:  However you want to do it.  It says you can

2:15 PM   18   produce or proffer.

2:15 PM   19        MR. HUDOCK:  If I may then proceed by proffer, Your

2:15 PM   20   Honor?

2:15 PM   21        THE COURT:  Go ahead.

2:15 PM   22        MR. HUDOCK:  The government's position is that while

2:15 PM   23   the defense has argued that he was afraid of the retribution of

2:15 PM   24   his co-conspirators, or that the police officers in Miami were

2:15 PM   25   on the take, that he has failed to meet the standards outlined

2:15 PM   1      in the various duress defense, and specifically as it relates to

2:15 PM   2      the Alvier case and also the Sixty Acres case.  And we would

2:15 PM   3      explanatory the following reasons:

2:15 PM   4              The testimony, as you heard, is that the defendant and

2:15 PM   5      his family were threatened, that the defendant was afraid that

2:15 PM   6      if he failed to participate that his family would be harmed, and

2:15 PM   7      that law enforcement, at least in the Miami area, was on the

2:15 PM   8      take.  The fact is though, Judge, that we have physical evidence

2:16 PM   9      that will show on multiple occasions the defendant was not in

2:16 PM  10      the Miami area, that he had ample opportunities to report this

2:16 PM  11      information to law enforcement in Broward County, Palm Beach

2:16 PM  12      County, St. Lucie County and Martin County.  We also have

2:16 PM  13      evidence to show that the defendant had the ability to abate his

2:16 PM  14      conduct by his ability to travel and also because these threats

2:16 PM  15      were not in fact immediate.

2:16 PM  16              But more importantly, we will be presenting evidence at

2:16 PM  17      trial that will show that the defendant's proffered testimony is

2:16 PM  18      in direct conflict with statements that he made to some of the

2:16 PM  19      people that were just described by defense counsel.  We will be

2:16 PM  20      entering and admitting text messages between the defendant and

2:16 PM  21      Christian Tinajero in which the defendant threatens Mr. Tinajero

2:16 PM  22      that he will quit this operation because he failed to be paid,

2:16 PM  23      and if he's not paid he will not continue with the operation.

2:17 PM  24              We will also provide evidence and testimony of the

2:17 PM  25      defendant's statements to Mr. Tinajero about what he plans to do

|         |    |                                                                       |
|---------|----|-----------------------------------------------------------------------|
| 2:17 PM | 1  | to the other witnesses in the case, and if I may quote, the           |
| 2:17 PM | 2  | statement that the defendant made in a voice recording was            |
| 2:17 PM | 3  | brother, I really want you to do things, cut his hair, torture        |
| 2:17 PM | 4  | him until he asks for forgiveness.  Do you understand.  And let        |
| 2:17 PM | 5  | him understand that he is a -- that he cannot be around like          |
| 2:17 PM | 6  | that in life.  Do you understand? He can get killed.  I'm going        |
| 2:17 PM | 7  | to forgive his life because of me.  Do you understand?  I will         |
| 2:17 PM | 8  | kill him.  I do not give an F, I think we need to scare.  This         |
| 2:17 PM | 9  | is the conversation that the defendant was having with                 |
| 2:17 PM | 10 | Mr. Tinajero, this is the person that he was allegedly afraid         |
| 2:17 PM | 11 | of, and yet the defendant is actively participating not only in      |
| 2:17 PM | 12 | the business of trafficking firearms, but threatening other          |
| 2:17 PM | 13 | people in the conspiracy.                                             |
| 2:17 PM | 14 | But perhaps the most damning evidence of all, Your             |
| 2:17 PM | 15 | Honor, is that the defendant was caught not in the United            |
| 2:18 PM | 16 | States, but traveling back to Ecuador.  When the defendant           |
| 2:18 PM | 17 | learned of these potential charges against him through the           |
| 2:18 PM | 18 | arrest of a co-conspirator, he traveled to the Bahamas and           |
| 2:18 PM | 19 | booked a flight from the Bahamas to Ecuador with a stopover in       |
| 2:18 PM | 20 | Panama.  HSI intercepted him in Panama moments before he was         |
| 2:18 PM | 21 | supposed to get on that flight to Ecuador.  So if the                |
| 2:18 PM | 22 | defendant's statements are true, his actions are in direct           |
| 2:18 PM | 23 | conflict with those statements.  He abated his conduct when he       |
| 2:18 PM | 24 | knew law enforcement was on to him.  He threatened people            |
| 2:18 PM | 25 | involved in the conspiracy, and he threatened people that he         |

2:18 PM   1    just described at that party who allegedly told him he had to

2:18 PM   2    continue with this conspiracy or he would kill their family.

2:18 PM   3    But the only reason he tried to abate his conduct was law

2:18 PM   4    enforcement and the failure to be paid.

2:18 PM   5        And so Your Honor, with respect, we would disagree with

2:18 PM   6    the accuracy or the veracity of the proffered testimony and

2:18 PM   7    argue that the defense has not met their burden, specifically as

2:19 PM   8    the duty to report and abate because the defendant was not under

2:19 PM   9    constant surveillance.

2:19 PM  10        THE COURT:  Mr. Cohen?  Comments?

2:19 PM  11        MR. COHEN:  Your Honor, again, it's our respectful view

2:19 PM  12    that we've met the burden and, you know, I think it's the jury's

2:19 PM  13    -- I think it's the jury's job to decide whether or not to

2:19 PM  14    believe Mr. Chica-Giler.  Again, you know, it doesn't have to be

2:19 PM  15    strong evidence according to the case law or even credible

2:19 PM  16    evidence, it just needs to be a scintilla of evidence.

2:19 PM  17        In terms of the immediacy, the abatement, Your Honor,

2:19 PM  18    you know, once he is threatened by higher level people from Los

2:19 PM  19    Choneros and Jose Adolfo Fito Macias Villamar, whose name I

2:19 PM  20    spelled before, that individual, the high-level individual in

2:20 PM  21    Los Choneros, and based on the threats from that individual, you

2:20 PM  22    know, my client feels boxed in and feels like he's got no choice

2:20 PM  23    but to participate in this and to do whatever he needs to do to

2:20 PM  24    survive and make sure his family is not harmed.

2:20 PM  25        And that's our position, Your Honor.

| | | |
|---|---|---|
| 2:20 PM | 1 | THE COURT:  What evidence do you have that the threat |
| 2:20 PM | 2 | of harm continued throughout the entire duration of the crimes? |
| 2:20 PM | 3 | I didn't hear any. |
| 2:20 PM | 4 | MR. COHEN:  Your Honor, there's a decisive quote, and |
| 2:20 PM | 5 | if I didn't emphasize it enough in my proffer, I apologize to |
| 2:20 PM | 6 | the Honorable Court.  Jose Adolfo Fito Macias Villamar, during |
| 2:20 PM | 7 | that Zoom conference with all the individuals, he directly tells |
| 2:20 PM | 8 | my client if you deviate from this plan, we're going to get you. |
| 2:20 PM | 9 | So in my client's mind, from his perspective and from a |
| 2:21 PM | 10 | preponderance of the evidence point of view, my client is always |
| 2:21 PM | 11 | afraid and looking over his shoulder because if he withdraws and |
| 2:21 PM | 12 | he gets the police involved -- and remember, my client's |
| 2:21 PM | 13 | maintaining that there's rogue officers in this case.  He can't |
| 2:21 PM | 14 | identify them by name, can't identify them by badge and he can't |
| 2:21 PM | 15 | identify them by police department, but there's a built-in in |
| 2:21 PM | 16 | mistrust because he knows that Los Choneros has inside police |
| 2:21 PM | 17 | officers in South Florida that will let them know what's going |
| 2:21 PM | 18 | on so.  He's mistrustful of the police and he feels like he |
| 2:21 PM | 19 | can't go to them. |
| 2:21 PM | 20 | And that's the reason -- that's why it's our respectful |
| 2:21 PM | 21 | view, Your Honor, that we get beyond, you know, that issue that |
| 2:21 PM | 22 | could be problematic for us in terms of the elements.  It's from |
| 2:21 PM | 23 | the point of view of my client. |
| 2:21 PM | 24 | THE COURT:  What were the specific threats?  You |
| 2:21 PM | 25 | mentioned the one saying if you don't continue with the plan, |

2:22 PM   1    whatever that was.  What other specific threats were there?  You

2:22 PM   2    mentioned that he was threatening the family.

2:22 PM   3         MR. COHEN:  The specific threat was we're going to kill

2:22 PM   4    your family and we're going to kill you.  And it's not only your

2:22 PM   5    parents, it's everyone in your family.  Adults, children.  You

2:22 PM   6    know, the Los Choneros have a brutal reputation.

2:22 PM   7         THE COURT:  Yeah, I don't think there's enough for a

2:22 PM   8    duress defense at this point.  He had ample opportunities to go

2:22 PM   9    to the authorities.  I know that there's some risk involved, but

2:22 PM   10   there are ample opportunities to go to the authorities all over.

2:22 PM   11   They didn't take all of his cellphones and the ability to make a

2:22 PM   12   telephone call to Washington D.C., to wherever.

2:22 PM   13        No, I don't think that there's sufficient here for a

2:22 PM   14   duress defense.  I think that duress defenses are very, very

2:22 PM   15   limited in nature, I don't believe there is enough here.  What

2:23 PM   16   was the plan that there was supposed to be?  What was the plan

2:23 PM   17   that was in effect that he was supposed to follow?

2:23 PM   18        MR. COHEN:  The plan that he was supposed to follow was

2:23 PM   19   he to buy arms in Dade County, Broward County, Palm Beach County

2:23 PM   20   and St. Lucie County and to take those arms and put them in

2:23 PM   21   tanks, and solder the tanks.  And some of the codefendants in

2:23 PM   22   this case helped him with soldering the tanks and taking them to

2:23 PM   23   different packaging facilities, and there was a whole

2:23 PM   24   methodology that one of the flipping codefendants, his name is

2:23 PM   25   Salgado, he taught my client how to package everything and to

|          |    |                                                                     |
|----------|----|---------------------------------------------------------------------|
| 2:23 PM  | 1  | make sure that they can avoid detection from the x-ray screening    |
| 2:23 PM  | 2  | at the various packaging places and that's what my client would     |
| 2:24 PM  | 3  | do.  And then they would send the arms to Los Choneros in           |
| 2:24 PM  | 4  | Ecuador, and that was the plan that he had to follow.  And this     |
| 2:24 PM  | 5  | individual was sent by Ernesto Teran to teach my client what to     |
| 2:24 PM  | 6  | do.                                                                 |

THE COURT:  And that's fine, but that seems to me that it's highly divisible into various plans, not one plan.  And that there was ample opportunity between shipments and between soldering and between secreting arms to do all sorts of things. That's the weakness of your position.

MR. COHEN:  Your Honor, we understand that and our counter, our respectful counter argument to that is because of the nature of the threat, from my client's point of view he believed that there was a constant immediacy of threat so that he couldn't call law enforcement to let them know what was going on when he wasn't supervised by any of these individuals, especially Ernesto.

THE COURT:  You're talking about something that went for like nine months, wasn't it?

MR. COHEN:  Correct, Your Honor.  My client was fearful for his life every day.  That's his position.

THE COURT:  Gestation period of a human being. Certainly very, very long time and a very, very long time to be constantly under the microphone so to speak.  Afraid, yes.  But

2:25 PM 1    in a position where he couldn't -- where he couldn't -- I don't

2:25 PM 2    know, where he couldn't complain to authorities if he thought

2:25 PM 3    there was -- I mean, every cop in Dade County can't be on the

2:25 PM 4    take.  Every cop in Broward, Palm Beach.  If they are, go to the

2:25 PM 5    Florida Department of Law Enforcement, the Federal Bureau of

2:26 PM 6    Investigation.  I don't know.  It just seems like there's a lot

2:26 PM 7    of holes in that.  My inclination is to not permit the duress

2:26 PM 8    defense.

2:26 PM 9              MR. COHEN:  Your Honor --

2:26 PM 10             THE COURT:  I certainly will not permit the duress

2:26 PM 11   defense in the absence of the defendant testifying, and if he

2:26 PM 12   testifies I will consider whether to permit it, but I'm not

2:26 PM 13   going to -- my inclination is even if he testifies I'm not

2:26 PM 14   buying it.  But I suppose that he could convince me that he's

2:26 PM 15   telling the truth and that he had no opportunity, but I suspect

2:26 PM 16   that he'll be cross-examined vigorously about that and about all

2:26 PM 17   other aspects of the plan and his opportunity to advise the

2:27 PM 18   authorities, particularly with the flip defendants as you have

2:27 PM 19   referred to them.

2:27 PM 20             All right.  Well, I don't think I need to say any more

2:27 PM 21   than that at this point.

2:27 PM 22             MR. COHEN:  Your Honor?

2:27 PM 23             THE COURT:  Yes.

2:27 PM 24             MR. COHEN:  Your Honor, can you indulge us and I can go

2:27 PM 25   into a break-out room with Mr. Chica-Giler?

2:27 PM   1          THE COURT:  Not by my expertise, but I suspect that

2:27 PM   2     there's somebody on my staff that knows how to do that.  Yes.

2:27 PM   3          MR. COHEN:  I'm assuming they do, Your Honor.  I would

2:27 PM   4     like to have a conversation with him, and then I --

2:27 PM   5          THE COURT:  Is it easier for you to use the

2:27 PM   6     interpreter?  I know you speak some Spanish, but would it be

2:27 PM   7     better for you?

2:27 PM   8          MR. COHEN:  Your Honor, my mother -- I couldn't speak

2:27 PM   9     English until I was six years old.  My parents are from Spanish

2:27 PM   10    Morocco, from Tangiers.  But the Spanish interpreter can join us

2:27 PM   11    as well.

2:27 PM   12         THE COURT:  Okay.  Can we do that, Alexandra?  I've

2:28 PM   13    been told that it can be done.

2:28 PM   14         MR. COHEN:  Thank you, Your Honor.  And we appreciate

2:28 PM   15    your patience.

2:28 PM   16         THE COURT:  I'm not the slightest bit patient, but I'm

2:28 PM   17    willing to wait.

2:28 PM   18         MR. COHEN:  Thank you, Your Honor.

2:28 PM   19         THE COURT:  Please explain to Mr. Chica-Giler that we

2:28 PM   20    are setting up the ability for him to communicate directly with

2:28 PM   21    his attorney without any of the rest of us hearing it.  When

2:28 PM   22    you're ready to go back on the record Mr. Cohen, please raise

2:28 PM   23    your hand and wave it wildly and we'll go from there.

2:28 PM   24         MR. COHEN:  Thank you, Your Honor.

2:28 PM   25         THE DEFENDANT:  Yes, Your Honor.  Thank you very much.

| | | |
|---|---|---|
| 2:29 PM | 1 | THE COURT:  They're on.  Tell them. |
| 2:29 PM | 2 | IT TECHNICIAN:  Yes, did you need me to put the jail |
| 2:29 PM | 3 | and Mr. Cohen and the interpreter in the break-out room? |
| 2:29 PM | 4 | THE COURT:  The interpreter, Mr. Cohen and the jail in |
| 2:29 PM | 5 | the break-out room, please. |
| 2:29 PM | 6 | IT TECHNICIAN:  Okay.  No problem.  Give me one second. |
| 2:30 PM | 7 | I just didn't know if the jail -- if he was like -- to use his |
| 2:30 PM | 8 | computer there.  Somebody would have to select it, but it looks |
| 2:30 PM | 9 | like he did. |
| 2:30 PM | 10 | LAW CLERK:  Perfect.  Thank you, Mike. |
| 2:30 PM | 11 | IT TECHNICIAN:  No problem. |
| 2:30 PM | 12 | THE COURT:  How do they get back to us, Mike? |
| 2:30 PM | 13 | IT TECHNICIAN:  When they're done there's a little |
| 2:30 PM | 14 | prompt there that says "close room", or if they're taking too |
| 2:30 PM | 15 | long, Your Honor, you can tell me and I can close the room or I |
| 2:30 PM | 16 | can join in and let them know. |
| 2:30 PM | 17 | THE COURT:  Why don't you tell them right now that |
| 2:30 PM | 18 | that's what they have to do when they're done, because I thought |
| 2:30 PM | 19 | they would be visible and they could just wave at us, but no. |
| 2:30 PM | 20 | IT TECHNICIAN:  No.  No.  Once they're in a break-out |
| 2:30 PM | 21 | room, they're completely separate from us.  It's more of a |
| 2:30 PM | 22 | privacy thing.  I'll let them know. |
| 2:38 PM | 23 | (Brief recess) |
| 2:44 PM | 24 | (Court called to order) |
| 2:44 PM | 25 | THE COURT:  Okay.  What's next? |

2:44 PM  1          MR. COHEN:  Your Honor, I had an authentic dialogue

2:44 PM  2    with my client.  We're going to -- he's going to think about

2:44 PM  3    whether or not he's going to entertain entering a plea in this

2:44 PM  4    case.  I will know either tomorrow, assuming that I can get a

2:44 PM  5    video conference with him at the St. Lucie County Jail, or

2:44 PM  6    Monday in court.

2:44 PM  7          THE COURT:  Okay.  Well, I don't have any control over

2:45 PM  8    the St. Lucie County Jail, but I think they are far more liberal

2:45 PM  9    than the FDC in Miami as far as conferences.

2:45 PM  10          MR. COHEN:  They're wonderful to deal with, Your Honor.

2:45 PM  11          THE COURT:  Well, that's good.  If I ever get put in

2:45 PM  12    the slammer, I'll try to make arrangements to have it in Fort

2:45 PM  13    Pierce, but I'll try to avoid it anyway.

2:45 PM  14          Okay.  Well, we'll be in Fort Pierce Monday morning

2:45 PM  15    ready to go.  The only problem we have is we're going to be

2:45 PM  16    calling a jury Monday morning, and that means there's going to

2:45 PM  17    be 50 or 60 people that are going to be terribly inconvenienced

2:45 PM  18    and that will go a long way toward acceptance of responsibility.

2:45 PM  19          MR. COHEN:  And that's been explained to

2:45 PM  20    Mr. Chica-Giler, Your Honor.

2:45 PM  21          THE COURT:  Okay.  Not a problem.

2:45 PM  22          MR. COHEN:  The prosecutor and I get along very well

2:45 PM  23    and we talk all the time, so I'll keep him posted as to any

2:45 PM  24    developments.

2:46 PM  25          THE COURT:  He's a smart guy.  He's easy to get along

2:46 PM   1   with.  All right.

2:46 PM   2          MR. COHEN:  He's also got a great head of hair, Your

2:46 PM   3   Honor.

2:46 PM   4          THE COURT:  I'm very jealous.

2:46 PM   5          MR. COHEN:  I'm more jealous.

2:46 PM   6          THE COURT:  Well, that's because you're not looking at

2:46 PM   7   mine from the top.

2:46 PM   8          All right.  Then we'll be in recess, there's nothing

2:46 PM   9   further to do at this point.

2:46 PM  10          Yes, sir.  Mr. Hudock.

2:46 PM  11          MR. HUDOCK:  We had provided, per your order, a copy of

2:46 PM  12   the joint jury instructions with the objections by the

2:46 PM  13   government in bold and the objections by defense counsel in

2:46 PM  14   Italics.  I didn't know if Your Honor wanted to discuss them now

2:46 PM  15   or before -- during a charge conference.

2:46 PM  16          THE COURT:  It wouldn't do me a lot of good to --

2:46 PM  17   wouldn't do me a lot of good to discuss them at this point.  I

2:46 PM  18   think I'll wait and we'll talk about them during a break on

2:46 PM  19   Monday.

2:46 PM  20          MR. HUDOCK:  Yes, Judge.

2:46 PM  21          MR. COHEN:  Your Honor, there's one more issue that I

2:46 PM  22   want to bring to your attention.

2:46 PM  23          THE COURT:  All right.

2:47 PM  24          MR. COHEN:  You do want to hear it or you don't?

2:47 PM  25          THE COURT:  I am here I say.  Go for it.

2:47 PM  1          MR. COHEN:  The St. Lucie County Jail wants me

2:47 PM  2     delivering Mr. Chica-Giler's clothing that his family sent me

2:47 PM  3     directly to the courthouse.  The marshal that is in charge of

2:47 PM  4     that process is on a detail for Judge Reinhart.  I was a little

2:47 PM  5     skeptical of that because my experience is you take the clothing

2:47 PM  6     to the jail, then they dress him up at the jail.  But they said

2:47 PM  7     no.  They said in Fort Pierce you have to bring the clothing

2:47 PM  8     into the courthouse.  So I'll arrive much earlier at the

2:47 PM  9     courthouse with the clothing, and I'll go to the marshal's

2:47 PM  10    office and hopefully things work out.  But in my collective

2:47 PM  11    experience that's not how things are done, but that's how

2:47 PM  12    they're telling me things are done.

2:47 PM  13         THE COURT:  I think that's how it's done in Fort Pierce

2:47 PM  14    and I haven't really had any problem.  I haven't had any

2:48 PM  15    prisoners show up in striped uniforms or orange jumpsuits.

2:48 PM  16         MR. COHEN:  I just don't want to upset the Honorable

2:48 PM  17    Court with delaying things.

2:48 PM  18         THE COURT:  We can work it out.  Listen, I'm used to

2:48 PM  19    delay.  Delay is my middle name.  I'll be happy to deal with it.

2:48 PM  20         All right.  Mr. Hudock, anything else we need to talk

2:48 PM  21    about?  If not, I'll await some word tomorrow because it would

2:48 PM  22    be most helpful to be able to call off the jurors if that's

2:48 PM  23    what's going to be.  Whatever it is it is.

2:48 PM  24         MR. COHEN:  Your Honor, as soon as I get off I'm going

2:48 PM  25    to try to make an appointment and I'll let Ms. Quinn know what's

2:48 PM 1  going on.  I'll also let --

2:48 PM 2          THE COURT:  She's my brain anyway, so don't worry.  You

2:48 PM 3  tell her, I either know about it or should.

2:48 PM 4          Thank you very much.  Have a good evening, and if I

2:48 PM 5  don't talk to you again, have a great weekend, we'll see you

2:48 PM 6  Monday.

2:48 PM 7          MR. COHEN:  Thank you, Your Honor.

2:48 PM 8          THE COURT:  All right.  Bye.

2:48 PM 9          (PROCEEDINGS CONCLUDED)

2:48 PM 10                    C E R T I F I C A T E
           I certify that the foregoing is a correct transcript from the
2:48 PM 11  record of proceedings in the above-entitled matter.

2:48 PM 12  1/9/2023_____         /s/ Dawn M. Savino, R.P.R., C.R.R.
           Date                         DAWN M. SAVINO, R.P.R., C.R.R.

2:48 PM 13

2:48 PM 14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION**